

Stradley Ronon Stevens & Young, LLP
300 Delaware Avenue, Suite 800
P.O. Box 2170
Wilmington, DE 19899-2170
Telephone (302) 576-5850
Fax (302) 576-5858
www.stradley.com

Michael P. Migliore
(302) 576-5850
mmigliore@stradley.com

October 3, 2007

**VIA HAND-DELIVERY**

The Honorable Sue L. Robinson
J. Caleb Boggs Federal Building
844 North King Street
Room 6124, Lockbox 31
Wilmington, DE 19801

Re:  ***Kloth v. Southern Christian University, and its Board of Directors***
**U.S.D.C. Del., Civil Action No. 06-CV-244 (SLR), and the Appeal of Joan T.**
**Kloth to the Third Circuit Court of Appeals, Case No. 07-3376**

Dear Judge Robinson:

We write as counsel for Defendants Southern Christian University and its Board of Directors. By way of information for the Court, on September 28, 2007, Southern Christian University and its Board of Directors (collectively "Southern Christian") filed *Appellees' Motion to Stay Appellant's Appeal and Briefing Related Thereto until Final Adjudication of Appellant's Motion for Reconsideration* (the "Motion") with the Third Circuit Court of Appeals in this matter as prematurely appealed by Plaintiff Kloth and captioned as *Kloth v. Southern Christian University, and its Board of Directors*, Third Circuit Court of Appeals Case No. 07-3376 (the "Appeal"). In its Motion, Southern Christian has requested either that the Third Circuit dismiss the Appeal without prejudice in view of the Appeal being premature, or to stay the Appeal until Your Honor has finally adjudicated the post-judgment motions filed by Plaintiff Kloth. We enclose a courtesy copy of the Motion for the Court's convenience. Counsel stand ready to address any questions Your Honor may have regarding this matter.

Respectfully submitted,

Michael P. Migliore

Michael P. Migliore

cc:  Plaintiff / Appellant Joan T. Kloth (via first class mail)

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT



No. 07-3376

**JOAN T. KLOTH,**

Appellant,

v.

**SOUTHERN CHRISTIAN UNIVERSITY,
BOARD OF DIRECTORS, *et al.*,**

Appellees.

---

**On Appeal from the United States District Court
for the District of Delaware
Civil Action No. 06-CV-244 (SLR)**

---

**APPELLEES' MOTION TO STAY APPELLANT'S APPEAL AND BRIEFING
RELATED THERETO UNTIL FINAL ADJUDICATION
OF APPELLANT'S MOTION FOR RECONSIDERATION**

---

Kevin W. Goldstein
Michael P. Migliore
STRADLEY RONON STEVENS & YOUNG, LLP
300 Delaware Avenue, Suite 800
Wilmington, DE 19801
Telephone: (302) 576-5850
Facsimile: (302) 576-5858

Appellees Southern Christian University and its Board of Directors (collectively, "Southern Christian," and herein referred to as "Defendants" or "Appellees") hereby move for an order staying or, in the alternative, dismissing Appellant's Appeal (and all briefing related thereto) to the United States Court of Appeals for the Third Circuit (the "Third Circuit") that was filed by appellant Joan T. Kloth ("Plaintiff" or "Appellant") until the United States District Court for the District of Delaware (the "District Court") has decided and adjudicated, as a final matter, Appellant's motion for reconsideration.

### Procedural Background

In April 2006, Plaintiff/Appellant Kloth filed a Complaint with the District Court against Defendants Southern Christian.[1]  District Court Docket No. 2.  In response, Defendants/ Appellees Southern Christian filed a motion to dismiss the Plaintiff's Complaint based upon a lack of personal jurisdiction over Defendants.[2]  District Court Docket No. 12.  On July 16, 2007, the District Court, by way of its Memorandum Opinion and Order (District Court Docket Nos. 28 and 29) (collectively, the "Order"), granted Defendants'/Appellees' motion to dismiss Plaintiff's Complaint.  Thereafter, Plaintiff Kloth filed a motion for reconsideration of the District Court Order.  District Court Docket No. 32 (the "Motion for Reconsideration"), attached hereto as Exhibit A.  On the same day that she filed her Motion for Reconsideration, Plaintiff/Appellant Kloth also filed a Notice of Appeal relating to the Order (the "Appeal").  District Court Docket No. 33.  Moreover, Defendants/Appellees note that Plaintiff/Appellant has

---

[1] Plaintiff later filed an amended complaint.  District Court Docket No. 11.

[2] For purposes of economy and because certain of the pleadings filed by Appellant are not relevant to Appellees' present motion to stay Appellant's Appeal, the full record before the District Court is not being recited herein. Southern Christian notes, however, that Defendants'/Appellees' Motion to Dismiss the Plaintiff's/Appellant's Complaint has been fully and extensively briefed before the District Court – indeed, Plaintiff/Appellant filed several sur-replies in relation to the Motion.

recently filed a second post-judgment motion with the District Court seeking, among other things, that the District Court once again reconsider its Order. District Court Docket No. 44; attached hereto as Exhibit B.

**The Appellant's Appeal Should be Stayed**

The Appellant's timely-filed Motion for Reconsideration remains pending before the District Court. Critical to this Appeal, Appellant's Motion for Reconsideration had the effect of staying the Appeal. *See, S. Freedman and Co. v. Raab, et al.,* 2006 WL 1275922, *2 (3d Cir. May 10, 2006) (noting that a timely-filed motion for reconsideration tolls the time period for filing a notice of appeal); *see also, Fed. R. App. P.* Rule 4(a)(4). As such, until the District Court has ruled on Appellant's Motion for Reconsideration and the District Court has entered a *final*, appealable judgment, Appellant's appeal is not "ripe" for consideration by this Court. *See, Adapt of Philadelphia, et al., v. Philadelphia Housing Authority, et al.,* 433 F.3d 353 (3d Cir. Jan. 9, 2006) (noting that the Third Circuit "may only hear appeals from *final* judgments of the district courts.") (emphasis added); *see also,* 28 U.S.C. § 1291. In view of Plaintiff/Appellant Kloth's motion for reconsideration, jurisdiction over this matter remains with the District Court until the District Court has entered a final, appealable order. *See, generally, Arthur v.Maersk, Inc., et al.,* 434 F.3d 196, Case No. 04-3670 (3d Cir. 2006) (noting that, under 28 U.S.C. § 1291, a circuit court has jurisdiction over final judgments only). Therefore, Appellant Kloth's Appeal is premature and should be dismissed without prejudice for want of proper appellate jurisdiction, or should be held in abeyance until a final, appealable order is entered by the District Court.

2

In view of the above reasoning and argument, the Defendants/Appellees respectfully

move this Court for entry of an order staying Appellant's Appeal and briefing related thereto

until such appropriate time after the District Court has fully and finally adjudicated the pending

Motion for Reconsideration filed by Appellant.

STRADLEY RONON STEVENS & YOUNG, LLP

September 2̲8̲, 2007

*Michael P. Migliore*

Kevin W. Goldstein (DE Bar #2967)
Michael P. Migliore (DE Bar #4331)
300 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
(302) 576-5850

Attorneys for Defendants/Appellees,
Southern Christian University
and its Board of Directors

3

# Exhibit A

UNITED STATES DISTRICT COURT

AND FOR THE DISTRICT OF DELAWARE

CASE NO. 06-244-SLR

Joan T. Kloth                                        APPELLANT/PLAINTIFF

     Vs.

Southern Christian University;                       APPELLEE/DEFENDANTS
Board of Directors, et.al

### Motion for Reconsideration



State of Delaware:
County of New Castle:
SS,

    I, Joan T. Kloth, Appellant/Plaintiff, respectfully request the reconsideration of the dismissal of my case against Southern Christian University, now known as Regions University and hereafter referred to as SCU based on the following facts:

1) First, Appellant/Plaintiff was informed that I needed to state in fact as to the late filing of this Motion for which an extension of time was requested. Appellant did not receive the judge's order regarding the dismissal of the case until 8 days after it had been issued. As well, Appellant/Plaintiff being pro-se needs additional time to research the laws on personal jurisdiction as well as try to find a pro-bono attorney to help her with this case or at least one who will work on a contingency fee basis. In addition, Appellant/Plaintiff's Congressional Leader is very concerned about the financial ramifications a distance learning student faces if his/her institution commits fraud, and breach of contract to provide a complete education and hides behind a wall of personal jurisdiction trying to force the student to lodge their suit only in the state where the school is physically located such as Alabama and Tennessee.

Without this Motion for Extension of time to file, the courts would be placing too high of a burden on the pro-se Appellant/Plaintiff to do the necessary research with the limited knowledge and resources she has available to her.

2) Appellant/Plaintiff paid the required tuition fees (amounting to approximately $59,000) via student loans in good faith and SCU accepted this tuition, which would indicate a contract between the school and the student whether it be in the actual classroom or via distance learning, which would include Internet participation, phone call, or attendance via the Internet. In addition, accreditation

1

requires all school programs are complemented by support structures and resources that allow for the total growth and development of its students.

3) On page 2 of the Memorandum of Opinion, the judge states in background notes that Marvin Cox, Appellant/Plaintiff's then Graduate Advisor for the school of Human Services, told Appellant/Plaintiff that she needed to complete "600 hours of clinical work broken down into 250 hours of individual counseling, 250 hours of couples/group counseling, and 100 hours of supervised counseling." Appellant/Plaintiff recognizes the Judge believed Mr. Cox told Appellant/Plaintiff what she needed to complete but, in fact, Mr. Cox never told her as no such conversation nor contact ever occurred between SCU, Mr. Cox and Appellant/Plaintiff informing Appellant/Plaintiff of any such clinical hours nor it's breakdown. In addition, no such information was passed on through their Ethics and Professional Identity Class and if mentioned, it was as a side note and not something that was told to the students as being of major importance.

4) On page 5 of the Memorandum of Opinion, Paragraph 2, the Judge states that Appellant/Plaintiff withdrew from SCU. Appellant/Plaintiff realizes the Judge may have reached the decision that Appellant/Plaintiff withdrew from SCU, however, that is inaccurate as Appellant/Plaintiff has never withdrawn from SCU. Appellant/Plaintiff has never filed withdrawal notices requesting to be withdrawn from SCU. Appellant/Plaintiff was forced to put her schooling on hold, as she had no other classes to take except for her final clinical class. In order to be eligible for financial aid, Appellant/Plaintiff would have to enroll in a minimum of two classes, and with no income, Appellant/Plaintiff could not afford to pay for any additional classes at SCU at that time. Because of the clinical training requirement to complete the desired degree, Appellant/Plaintiff could do nothing but continue to look for clinical training sites even though SCU provided no assistance and many of the sites found were not acceptable to SCU.

5) On page 5 of the Memorandum of Opinion, last paragraph, SCU's website provides far more than just information. SCU is clearly promoting and pushing their Distance Learning education and hardly mentions classes being available on site at the physical campuses in AL or TN. The majority of SCU's students attend classes via the Internet. The ratio of Distance Learning Students to students in the physical classroom was at minimum 3:1 in almost all of the Appellant/Plaintiff's classes. Distance learning is becoming more and more sought after as it provides the student who is unable to obtain the degree from a general college to obtain the degree via the internet. With current technology, it is now easier to obtain the degree from the student's home or even office environment. Furthermore, it is from SCU'S website, that the Appellant/Plaintiff attended her classes by accessing the schools proprietary software called "Blackboard", which enables students to not only communicate in real time with their professors and the other students in class at the exact time of the class. Also, all distance learning students must complete their tests on-line and submit them through the school's website and proprietary software. In addition, all distance learning papers and class work was

submitted in the same way. This clearly would prove that SCU is an Interactive School, and would thus fall under the rules of the "Zippo Test" for Interactive as well as a Commercial Website Jurisdiction, thereby giving this Court jurisdiction to hear this case. Exhibit AA

6) On Page 6 of the Memorandum of Opinion, Appellee/Defendant claims they never intentionally target any promotions or recruiting efforts toward DE, but what they do is direct promotions and advertising to anyone in the world to be educated through them via the Internet. Thereby reinforcing the fact that personal jurisdiction would be in the state and county where the student resides. It is unduly burdensome, both financially and physically, for a student to be forced to file a case in another state. If the court enforces the lack of jurisdiction, it is limiting the recourse a student would have when the student believes the school or university has wronged them as in the case at hand. It is their big tag line, that is they advertise their distance learning program's convenience and accessibility as their slogan or motto and basis for their entire website and proprietary software they use to run their school. SCU is selling their products/services regardless of where the prospective students are located physically and with all class participation and work being completed via the Internet. They make no distinction as to what states or countries are not allowed to participate and in fact, advertise that they are internationally recognized and used for their distance-learning program thus making them further subject to the Zippo Test. They, in fact, encourage students to make use of distance learning. It would certainly be correct to assume distance learning would make it possible for the professors to teach from their home, which would actually seem to cut down on school expenses.

7) Appellee/Defendant also claims they have no other business relations in DE. Yet, they admit to having another student who attended their school from DE. In which case, they had additional information on possible sites or even doing her training through this student. SCU refused to even pass this information along despite knowing that Appellant/Plaintiff had moved to DE to attempt to find an acceptable clinical training site. Appellant/Plaintiff does recognize the need for confidentiality regarding releasing information on students, however, releasing information regarding a possible clinical site would/should be public knowledge. It would also seem it would be in the best interest of SCU to provide the student with assistance in finding a suitable clinical site as quickly as possible in order for the student to get the desired degree. In fact, during Appellant/Plaintiff's second to last or last semester she was able to attend, SCU did put forth a questionnaire to the students about whether they felt that help from the school finding a clinical training site would be an asset and whether or not the students would pay extra for this service, which as far as Appellant/Plaintiff is concerned should be included, not an extra charge. In fact, it would seem appropriate for SCU to have acceptable clinical sites located and would simply send the student's name to the site letting them know the student needs to complete their clinical training. Many colleges contact various businesses to make them aware they have these students

who could possibly become excellent employment candidates as it would give the business an opportunity to observe the student in "action" so to speak. This would promote good mouth-to-mouth advertising with the students being satisfied with the school upholding their advertisement of being a good place to obtain their degree, which is considered the best form of advertisement. They are in the business of selling/providing an education to all those who chose to attend their school whether it be in the classroom physically or via the internet.

8) On page 6 of the Memorandum of Opinion, the Appellee/Defendant also claims they had no knowledge of the Appellant/Plaintiff's residence in DE, until the lawsuit. This is not a true statement. Not only did they know about Appellant/Plaintiff's move to DE but the year prior, they knew I was considering filing a lawsuit against them. The following are evidence of the Appellee/Defendant's complete knowledge more than two years prior to the suit being filed.

    a. On April 8, 2004, Appellant/Plaintiff notified Dr. Perry, her instructor, that she and her husband were very upset about the inability to get a clinical training site and the need to extend Appellant/Plaintiff's education far beyond what she had been told. In this letter, the Appellant/Plaintiff clearly stated that her husband was contacting his attorney regarding what our options were. Dr. Perry responded to this with an email. (Exhibit A)

    b. On June 8, 2004, John White, a representative of SCU accidentally emailed the Appellant/Plaintiff a copy of an email that was not intended for Appellant/Plaintiff, but for someone at SCU named "Butch." In this email, it is quite apparent that the Appellant/Plaintiff was already being blackballed. (Exhibit B)

    c. On January 8, 2005, in an email to John White, a representative for SCU, Appellant/Plaintiff informed him that Appellant/Plaintiff would have to move to another state possibly to get her clinical training. (Exhibit C)

    d. On April 1, 2005, after having moved to DE in February, in a complaint letter to Jack Allen at Southern Association of States and Colleges (hereafter known as SACSCOC), an agency, which accredits her school, Appellant/Plaintiff clearly states that she has moved to DE. (Exhibit D). Jack Allen contacted the school on her behalf regarding her issues.

    e. On or about April 15, 2005, via email correspondence, Appellant/Plaintiff's Professor, Dr. Wayne Perry, was told that Appellant/Plaintiff could not get papers faxed to the professor that he needed as she no longer lived in CT. She had been "forced to move her daughter and herself away from her husband to an entirely new state some 4 hours away." This was an entire year prior to the lawsuit being filed. (See Exhibit E)

4

f.  On August 13, 2005, Appellant/Plaintiff filed for a Fair Hearing with Appeals Committee of SCU concerning Appellant/Plaintiff's inability to obtain a clinical training site after 2 years of looking and was requesting reimbursement for her student loans.  On August 19, 2005, in correspondence with Barbara Alford, a representative of SCU, Appellant/Plaintiff clearly states that she now lives between DE and CT and what time would be best to contact her to do the Fair Hearing in DE. (Exhibit F)

g.  On August 24, 2005, a hearing over the telephone was held while Appellant/Plaintiff was in DE in her Apartment.  Appellant/Plaintiff and her daughter resided during the week in DE.  Appellee/Defendant called Appellant/Plaintiff on her DE home phone number to have this Hearing by Telephone. (Exhibit G)  As well, Appellant/Plaintiff's daughter was in a lesson with her coach from Elkton, MD at a facility in Newark, DE called the Pond.  (Exhibit H)  As this Hearing by Telephone was obviously by the evidence, held in DE, Appelle/Plaintiff was well aware of Appellant's/Plaintiff's move to DE and thus conducted business with her in DE.  Appellee/Defendant did purposefully contact and conduct business with the Appellant/Plaintiff while she resided in DE while she actually stood in her apartment talking with them on her DE landline phone.

h.  In addition, in the phone transcripts, on page 10, Appellant/Plaintiff clearly states "So I moved me and my daughter to Newark, DE".  This is clearly 9 months before the lawsuit was filed (Exhibit I)

i.  Also, in this transcript, Appellant/Plaintiff clearly states, on page 39 of the phone transcript, "I also will be passing it out to my attorney because we're looking to file a major lawsuit." (Exhibit J)  Thus Appellee/Defendant was clearly aware of the seriousness and intent of the Appellant/Plaintiff to file a lawsuit from her home in DE.

j.  On August 26, 2005, Appellant/Plaintiff again informed Ms. Barbara Alford, that she would be forced to file a lawsuit concerning this matter, especially since the Appeals Committee had denied her request. (Exhibit K)

k.  The Appeals Committee also neglected to inform Appellant/Plaintiff that if the first appeal was not successful with the committee, she could file an appeal to the next level.  Appellant/Plaintiff only knew that she could rebut back to them about the issue but had no idea there was a formal process for this appeal as Appellee/Defendant failed to inform her of this during or after the Hearing. (Please request this transcript with payment, as it is over 40 pages long).

l.  On August 31, 2005, Appellant/Plaintiff filed a complaint with the Better Business Bureau (BBB) about her situation with SCU. In this complaint, which was investigated by the BBB, Appellant/Plaintiff clearly states that she had to move to DE and this complaint was forwarded to SCU. (Exhibit L)

m.  On September 28, 2005, Appellant/Plaintiff formally filed a complaint with SACSCOC, which was sent to Belle Wheelan. In this complaint, Appellant/Plaintiff again states she have moved to DE. (Exhibit M) This complaint was sent on to SCU and thus they were again made fully aware of Appellant's/Plaintiff's move to DE. (Exhibit N)

n.  On or about October 07, 2005, a complaint was logged with Consumer Affairs, which forwarded it on to Montgomery Alabama's Consumer Affairs. Again, in this complaint, in the third sentence, the Appellant/Plaintiff clearly states, "having to move and live part-time in Delaware to find a clinical training site." (Exhibit O).

o.  On November 11, 2005, via Fax to the Appellant/Plaintiff, the Appellee/Defendant responded to the Attorney General's Office of Consumer Affairs in Montgomery, AL, concerning the complaint that Appellant/Plaintiff filed. Clearly, this shows that the Appellee/Defendant was well aware of the Appellant's/Plaintiff's move to DE and that she was pursing every avenue possible to remedy her situation without filing a lawsuit. (Exhibit P)

p.  On January 3, 2006, Appellant/Plaintiff still HAD not heard from SACSCOC and Appellant/Plaintiff emailed SACSCOC to update them and find out what was being done. Appellant/Plaintiff requested they not let this case just die in their office. She received a response back via email that she would soon receive a response from their office. (Exhibit Q)

q.  On January 4, 2006, Appellant/Plaintiff received a letter back from Belle Wheelan of SACSCOC stating that she had reviewed my complaint from September 28th 2005 in which Appellant/Plaintiff had stated she was living in DE (Exhibit N) and SCU's response to my complaint. Again, clearly, SCU was aware that Appellant/Plaintiff had moved to DE. (Exhibit R)

r.  On January 13, 2006, Appellant/Plaintiff responded to Belle Wheelan of SACSCOC's letter again reiterating to her about her move to DE. (Exhibit S)

s.  As with any product bought in one state, but moved to another state, i.e. a washing machine or an automobile, the warrantee and guarantee moves with the product to the new jurisdiction.

6

9) As is evidenced by the above information, Appellee/Defendant was not only aware of Appellant/Plaintiff's move to DE, but also her statement of an impending lawsuit to resolve the matter long before the lawsuit was filed. (Exhibits A, C, J & K) In the case of *World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1970)*, "A majority of the Court indicated that the purposeful availment requirement of minimum contacts could be satisfied when the Appellee/Defendant "should reasonably anticipate being haled into court." With this minimum contact, coupled with the fact that the Defendant/Appellee was made aware of the possibility of a lawsuit on FOUR separate occasions, and the fact they were clearly aware of Appellant/Plaintiff 's move to DE, personal jurisdiction can be thus established in DE and gives this court jurisdiction to hear this case.

10) Furthermore, under the Due Process laws, it appears that by requiring minimum contacts, courts prevent parties from engaging in what is called "forum shopping" because parties with deeper budgets could select jurisdictions that would make it inconvenient and too costly for their opponents to effectively mount a defense.

11) On page 6 of the Memorandum of Opinion, the Appellee/Defendant claims that the website provides general public information, degree program descriptions, and so on. Yet, it is through this very website that a Distance Learning student attends school and thus is directly involved in an interactive way with their education through the school. In addition, students attend school in real time via this same website with a link to their proprietary software from Blackboard. Through Blackboard a student signs into their class, chats in real time with their professor and other students as well as their professors, who could in countries and states all over the world. In addition, all tests are taken on through this website online and submitted online. And all papers are submitted directly to their teachers through this site online. This is clearly an Interactive website with students participating in real time with their professors and other students in a classroom setting via the Internet.

12) On Page 8 of the Memorandum of Opinion, in reference to the Long Arm Statute, Appellant/Plaintiff states that

a. In #1 the Appellee/Defendant does transact business and performs a service when they deliver their product (education) and performs a service when they accept Appellant/Plaintiff's papers, tests, grades them and then returns them to Appellant/Plaintiff corrected via the internet.

b. In #2 When Appellant/Plaintiff paid them money in good faith, it constituted a contract with SCU to provide Appellant/Plaintiff with an education (their product), the end result being Appellant/Plaintiff's dual Masters of the Arts Degree in Marriage and Family Therapy and Professional Counseling.

c. In #4, by delivering education and wrestling with Appellant/Plaintiff in Delaware, #4 also applies in DE.

13) On page 9 of the Memorandum of Opinion, SCU needs to take a closer look in the research of AS 3104(c)(2) as it also applies, and not just part AS 3104(c)(1). That is, the Appellee/Defendant omitted the important part of the paragraph of AS 3104(c) (2): "contracting to supply services or things in Delaware." By delivering their educational services (live classes, submittal of tests, papers and receipt of grades) to the Appellant/Plaintiff via the Internet, there is a repeated act of contact with DE and other states. In addition, Appellee/Defendant actually called and conducted a business (a hearing with their Appeals Committee) over the phone. In fact, Appellee/Defendant called Appellant/Plaintiff on her DE apartment landline phone. And all Appellant/Plaintiff's transactions with the school solely take place on the Internet. In fact, this is one of the reasons why no one would allow the Appellant/Plaintiff to do her clinical training with them, i.e. the only contact they had with her professor and the school was through email via the internet thus making all business transactions pertaining to the Appellant's/Plaintiff's education conducted through the internet.

14) On pages 9-10 of the Memorandum of Opinion, for specific jurisdiction, and the Appellee/Defendant's website designed to specifically commercially interact with the residents of the forum state, said website not only purposely avails itself to doing business in DE, but ALSO to doing business in any state or country in this world through it interactive abilities to communicate in real time as well as the submittal of papers, assignments, tests and obtaining of grades for all these items via their website.

15) In addition, on pages 9-10 of the Memorandum of Opinion, case law is cited about *Burger King, 471 U.S. and about World Wide Volkswagen v. Woodson, 444 U.S. 286* but this order neglects to go further with the United States Eighth Circuit Court decision in *Barone*, which does accept the "stream of commerce theory". In *Barone*, the 8th Circuit judges stated that when a foreign manufacturer "pour[s] its products into a regional distributor, i.e. in this case, the Internet, with the expectation that the distributor will penetrate a discrete, multi-state trade area, the manufacturer, i.e. in this case, SCU, the supplier of the education, "purposefully reaped the benefits" of the laws of each State in that trade area for due process purposes. *25 F.3d at 615.*

16) On page 11 of the Memorandum of Opinion, the court states that general jurisdiction may be exercised over a Appellee/Defendant whose contacts with the forum state are "continuous and substantial." SCU is simply hiding behind a label as they are purposely availing themselves as doing business with the Appellant/Plaintiff by accepting payments for a contract to provide an education no matter where the Appellant/Plaintiff resides. The contract between student and school has not been minimal but "continuous and substantial" in supplying

8

Appellant/Plaintiff with course material, tests and grading her assignments and papers. Therefore, establishing continuous and substantial contact with the Appellant/Plaintiff, does give the court jurisdiction to hear this matter.

17) On Page 12 of the Memorandum of Opinion, the *Blackburn V. Walker Oriental Rug Galleries, Inc. 999 f. Supp.* case further reinforces the evidence that, the first type of contact is when the Appellee/Defendant clearly does business over the internet, by knowing and repeated transmission of computer files over the internet, personal jurisdiction is proper. In this case, the Defendant/Appellee's distance learning education was completely and totally transmitted over the internet by the distribution of tests, graded tests, papers and graded papers as well as the transmission of live classes and communication with the professor and students in the class. In the second part of these standards of contact, that is the exchange of information with the host computer, clearly the transference of papers, tests and grades would constitute exchange of information, especially as this was the main and in some cases only way to transmit papers and test along with their scores and grades. Add to all of this that the only form of communication with Appellant/Plaintiff's professors was via email from her residence in CT and then when she was forced to relocate to DE trying to secure an acceptable clinical training site and during real time in class, clearly shows personal jurisdiction is relevant in DE as this is where Appellant/Plaintiff now resides.

18) On pages 12-13 of the Memorandum of Opinion, the topic of the nature and quality of the commercial activity relevance is discussed, i.e. the SCU website provides more than just general public information, degree program descriptions, admissions, registry, financial aid information and so on. In fact, the SCU website actually provides live classes and transmission of grades, assignments, and the ability to submit all of this information, thus the website is not just informative, it is clearly interactive as it is the only way one can attend the school in a distant learning style.

19) Appellee/Defendant clearly does business over the Internet (educational materials would fall in that category) and thereby giving this court personal jurisdiction should be proper. As the material was sent to Appellant/Plaintiff both via the Internet as well as the initial application information and school information, which was sent via the US mail, including the financial aid that was used to pay for Appellant/Plaintiff's education. Thereby sending the course material is an exchange of information between the Appellant/Plaintiff and Appellee/Defendant and thus a commercial activity initiated by the educational institution in order to elicit the sale of educational degrees with the Appellant/Plaintiff. And thus selling their course material would deem them to be a commercial business. Once again it is necessary to mention the fact that Appellant/Plaintiff paid the tuition in good faith expecting SCU to adhere to their responsibility of providing their product which in addition to class material would also include upon completion her desired degree. When money is exchanged in a commercial transaction, there

becomes a contract, in this case of distance learning, there are no bounds as to where the student is located physically, and in fact, SCU does not care where the student is located, so long as they get paid for providing their service, that of an education.

20) In further support of their commercial activity is the following: The site allows any interested students to submit online applications thereby creating a fiduciary relationship as Appellant/Plaintiff's application and money was accepted.

21) The school is selling a product to students who receive their course material via the Internet and thus forms a contact or interactive exchange with the student and is considered doing business. Sending material with the use of Internet is an established method of delivery to the student and even though Appellant/Plaintiff may have moved from CT to DE to seek a clinical there, Appellant/Plaintiff continued to have contact with the school, taking classes, submitting paperwork and tests as well as getting information. SCU did not care where Appellant/Plaintiff was located, and in fact, were very well aware for over 15 months prior to the lawsuit where the Appellant/Plaintiff was living, they were still sending Appellant/Plaintiff information and had contact with Appellant/Plaintiff on a regular basis. In fact, Distance Learning is now an acceptable way to sell their product, which is education as more and more schools are using this medium to increase their student base and international access. There are many schools now that are offering this type of learning to make it easier for students who are at a disadvantage of being able to attend the open classroom. When the schools established this type of learning, they are accepting the fact that there will be students from many areas and states that will take advantage of it. Therefore, the Court must accept the fact that the possibility does exist that when a problem such as this one at hand arises, the student will file the Action in their home state as it would present a hardship on any student to travel to AL or TN to file an Action. The University of Phoenix is a good example of how many people are taking advantage of Distance Learning.

22) Due to the school's neglect and disregard for the implied contract to provide an education and ultimately the desired degree to the Appellant/Plaintiff, she has been put in such a financial bind that she cannot even afford an attorney to help her with the justified action against SCU, thus putting Appellant/Plaintiff at an additional disadvantage.

Based on the above facts, the Appellant/Plaintiff respectfully requests this Court reconsider hearing this case.

Respectfully submitted:

JOAN T. KLOTH, PRO-SE
320 NORTH GEORGE'S HILL ROAD
SOUTHBURY, CT 06488
203-267-7801

11

UNITED STATES DISTRICT COURT

AND FOR THE DISTRICT OF DELAWARE

CASE NO. 06-244-SLR

Joan T. Kloth                                                    PLAINTIFF

     Vs.

Southern Christian University;                          DEFENDANTS
Board of Directors, et.al

### AFFIDAVIT OF SERVICE

State of Delaware:
County of New Castle:
SS,

     BE IT REMEMBERED THAT on this the 3ᴿᵈ day of the month
of August , 200 7 , I, Joan T. Kloth mailed, first-class postage prepaid, two
(2) copies of the Motion for Appeal, Motion for Reconsideration and Motion for IFP to
Southern Christian University and it's Board of Directors, via their Attorney, Kevin W.
Goldstein, Stradley, Ronon, Stevens and Young at 300 Delaware Avenue, Suite 800,
Wilmington, DE 19801.

Certified Registered Mail No. 7006 2760 0001 9911 2098
Return Receipt No. _____

Joan T. Kloth
Plaintiff, Pro-Se

# EXHIBIT AA

.on. Justice Brennan wrote for four justices who felt that the rule should apply because the party was purposefully availing himself of the benefits of being in the state at that time, and that the rule was fair under modern standards because it was well known, therefore putting defendants on notice of their susceptibility to suit in a state if physically present. The ninth vote, by Justice Stevens, agreed that jurisdiction was proper, but did not endorse either Scalia's or Brennan's test.

## Commercial activities

Merely placing products in the "stream of commerce" is insufficient to provide minimum contacts with the states where the products end up. The defendant must make an effort to market in the forum state or otherwise purposefully avail herself of the resources of that state. See *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980); *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987). However, since only four of the nine Supreme Court Justices joined the opinion that required a defendant to do more than place his products in a "stream of commerce," some lower courts still rule that doing so is adequate for a court to exercise personal jurisdiction.

Claims arising from the tort of defamation are treated by a different standard. See *Keeton v. Hustler* and *Calder v. Jones*.

### Internet activities

Courts have struggled with the Internet as a source of minimum contacts. Although not determinately established by the Supreme Court, many courts use the *Zippo* test, which examines the kind of use to which a defendant's website is being put. Under this test, websites are divided into three categories:

1. *passive* websites, which merely provide information, will almost never provide sufficient contacts for jurisdiction. Such a website will only provide a basis for jurisdiction if the website itself constitutes an intentional tort such as slander or defamation, *and* if it is directed at the jurisdiction in question;
2. *interactive websites*, which permit the exchange of information between website owner and visitors, *may* be enough for jurisdiction, depending on the website's level of interactivity and commerciality, and the amount of contacts which the website owner has developed with the forum due to the presence of the website;
3. *commercial websites*, which clearly do a substantial volume of business over the Internet, and through which customers in any location can immediately engage in business with the website owner, definitely provide a basis for jurisdiction.

## Property as a basis for jurisdiction

The Supreme Court has held that the mere fact of ownership of property within a state is *not* sufficient to provide minimum contacts for a court to hear cases unrelated to that property. *Shaffer v. Heitner*, 433 U.S. 186 (1977). However, the property alone provides a sufficient contact for a court having jurisdiction over that geographic area to adjudicate claims relating to the ownership of the property, or relating to injuries which occurred there. In that case, the jurisdiction exercised by the court is referred to *in rem* jurisdiction (i.e. jurisdiction over the thing), instead of *in personam* jurisdiction.

Where Traditional and Online Education Meet

**Regions University** is partnering with the U. S. Department of Education and 14 other higher educational institutions and consortia to develop models designed to help enhance access to federal student aid for distance education-based programs and test new models of financial aid delivery to students participating in distance learning programs. Combined, these outcomes will help ensure that the programs offered via distance learning are of high quality and maintain the integrity of the federal student financial aid programs.

Accredited by the *Commission on Colleges of the Southern Association of Colleges and Schools* (1866 Southern Lane, Decatur, Georgia 30033-4097; Telephone number 404-679-4501) to award the Bachelor of Science, Bachelor of Arts, Master of Science, Master of Arts, Master of Divinity, and Doctor of Ministry and Ph.D. Degrees. **Regions University has been providing distance-learning programs since 1993. Utilizing state-of-the-art technologies, Regions University's distance learning programs and services are delivered to students over the Internet and include the use of the latest streaming video and audio systems for course lectures.**

**Course lectures are broadcast through a video server and received on the student's computer through the Real Player software program in real-time (at the same time of the lecture) and on demand (at the student's convenience 24 hours a day, 7 days a week). Coupled with the use of these latest technologies, Regions University uses a comprehensive approach to distance learning that ensures that students have regular contact with course faculty via e-mail and telephone as well as through electronic discussion groups with students in each class. Course notes, assignments, and handouts are distributed and received through an easy-to-use student interface through the student's Internet browser. Also, course quizzes and exams are conducted on-line in a secure mode that ensures confidentiality of the student's answers and grades. Likewise, students are given an opportunity to evaluate their faculty and each course through an on-line system completed anonymously at the end of each course. Dr. Rex Turner, Jr., President of Regions University, believes that this comprehensive approach to distance learning is unique to Regions University.**

### College of Business and Leadership

- B.S. in Business Administration - Information Communication
- B.S. in Business Administration - General Business
- B.S. in Business Administration - Information Systems Management
- M.S. in Leadership and Management
- M.A. in Behavioral Leadership and Management

### College of General Studies

- Associate of Arts in Liberal Studies
- B.A. in Biblical Studies
- B.S. in Human Development
- B.S. in Human Resource Leadership
- B.S. in Liberal Studies
- B.S. in Management Communication
- B.S. in Ministry Bible
- B.S. in Public Safety and Criminal Justice
- B.S. in Public Safety and Business/Organization Security
- B.S. in Public Safety and Homeland Security

### School of Human Services

**Regions University**
Thank you for your interest in Regions University. Please complete the following form to request additional information.

\* Indicates required field

Please note that you must be a United States resident to qualify for this offer.

\* First Name:

Middle Name/Initial:

\* Last Name:

\* E-Mail Address:

\* Mailing Address:

\* City:

\* State:

\* Zip Code:

\* Telephone Number: (10 digits only)

Preferred Contact:

Contact Methods (Telephone, E-Mail, etc.)

Military Branch of Service (if applicable):

How did you discover Regions University?

\* Current Educational Status:

\* Program of Interest:

School of Human Services

- o M.A. in Marriage and Family Therapy
- o M.A. in Professional Counseling
- ⊃ M.S. in Pastoral Counseling
- o M.S. in Ministerial Leadership
- o M. Div. in Ministerial Leadership
- o M. Div. in Marriage and Family Therapy
- o M. Div. in Pastoral Counseling
- o M. Div. in Professional Counseling
- o D. Min. Family Therapy I
- o D. Min. Family Therapy II
- o Ph D. Family Therapy - Concentration in Marriage and Family Therapy
- o Ph D. Family Therapy - Concentration in Professional Counseling

**Turner School of Theology**

- o M.A. in Biblical Studies
- o M.A. in Practical Theology
- o Master of Divinity
- o Doctor of Ministry
- o Ph D. Biblical Studies

___ I would also like Financial Aid Information.

Comments:

Submit Request >>

Powered by CollegeandUniversity.net  |  Privacy Policy



# REGIONS UNIVERSITY
### Where Traditional and Online Education Merge

Formerly SCU Southern Christian University





Contact Us

Admissions

Schools & Programs

Financial Aid

Student Resources

About Regions University

Register for Fall 2007

- Request More Information
- Apply for Admission
- FAQ
- Prospective Students / Recruitment 1.800.789.8936
- General Questions/Business Office 1.800.351.4040
- Regions University's 2007 Graduation Highlights



View the 2007 Graduation Video
Requires Real Player to view this video.



⚬ **Program of Interest**
Please Select A Degree:

⚬ **Fall 2007 Course Schedule**
Undergraduate

Graduate

⚬ **About Regions University**
Mission & Accreditation





⚬ Beginning September 24 - 26, 2007  >>view schedule

⚬ **On August 2, 2006, the Board of Regents of Southern Christian University changed the institution's name to *REGIONS UNIVERSITY*.**
They determined that this name would enhance the university's opportunities and would complement the purpose and vision of this university as it accelerates it's educational and religious heritage of **Going into all the regions of the world.**                          **>>read more**

Regions University

Regions University is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools  (1866 Southern Lane, Decatur, Georgia 30033-4097; Telephone number 404.679.4501) to award Associate of Arts, Bachelor of Arts, Bachelor of Science, Master of Arts, Master of Science, Master of Divinity, Doctor of Ministry, and Doctor of Philosophy degrees.



# REGIONS UNIVERSITY
Where Traditions and Online Education Merge

formerly SCU Southern Christian University

**About Regions University**

Academic Calendar | Academic Catalog | Library Resources


Contact Us

Admissions

Schools & Programs

Financial Aid

Student Resources

About Regions University



Request More Information

Apply for Admission

FAQ

Call us 1.888.790.9086

## ACCREDITATION AND AUTHORIZATIONS

Regions University is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (1866 Southern Lane, Decatur, Georgia 30033-4097; Telephone number 404.679.4501) to award Associate of Arts, Bachelor of Arts, Bachelor of Science, Master of Arts, Master of Science, Master of Divinity, Doctor of Ministry, and Doctor of Philosophy degrees.

Regions University is authorized by the Alabama Department of Postsecondary Education to operate a private school pursuant to the Alabama Private School License Law.

Regions University is authorized by the Tennessee Higher Education Commission. This authorization must be renewed each year and is based on an evaluation by minimum standards concerning quality of education, ethical business practices, health and safety, and fiscal responsibility.

## INSTITUTIONAL MISSION STATEMENT

Regions University is an independent, coeducational institution dedicated to the spirit of its Christian ideals and heritage. Regions University's mission is to prepare men and women, through a commitment to academic excellence and spiritual vitality at the undergraduate and graduate levels, for a lifetime of learning, leadership, and service to the professions, society, church, and family.

## INSTITUTIONAL PURPOSE

In keeping with its Christian heritage, Regions University provides educational opportunities through five schools: (1) College of Business and Leadership, (2) College of General Studies, (3) School of Human Services, (4) Turner School of Theology, and (5) School of Continuing Education. Each of these schools has its own special purpose within the overall purpose and institutional goals of the University.

### Purpose of the College of Business and Leadership
The purpose of the College of Business and Leadership is to provide instruction and training on the undergraduate and graduate levels as well as prepare students for careers and professions that provide support and services for the well-being of individuals, family, or society. Within this purpose, the College of Business and Leadership provides bachelor-level degree programs that include the Bachelor of Science in Business Administration – General Business Concentration, Bachelor of Science in Business Administration – Information Communication Concentration, and the Bachelor of Science in Business Administration – Information Systems Management Concentration as well as graduate-level degree programs that include the Master of Science in Leadership and Management and the Master of Arts in Behavioral Leadership and Management. All of these programs are designed within the mission of the University for preparing men and women, through a commitment to academic excellence and spiritual vitality, so that they can serve in their chosen vocations in the church, community, or society. Also, the programs in the College of Business and Leadership provide a foundation that prepares undergraduate students for graduate study and graduate students for advanced study.
Additionally, the University provides a program of continuing education, through the Regions University School of Continuing Education, for those who are not pursuing degrees.

### Purpose of the College of General Studies

The purpose of the College of General Studies is to provide instruction and training on the undergraduate level for Christian ministers and religious workers as well as prepare students for careers and professions that provide support and services for the well-being of individuals, family, and society.   Within this purpose the College of General Studies provides degree programs in a variety of areas including Associate of Arts in Liberal Studies, Bachelor of Science in Ministry/Bible, Bachelor of Science in Biblical Studies, Bachelor of Science in Management Communication, Bachelor of Science in Public Safety and Criminal Justice, Bachelor of Science in Public Safety and Homeland Security, Bachelor of Science in Public Safety and Business/Organization Security, Bachelor of Science in Liberal Studies, Bachelor of Science in Human Development, and the Bachelor of Science in Human Resource Leadership, .  All of these programs are designed within the mission of the University for preparing men and women, through a commitment to academic excellence and spiritual vitality at the undergraduate level, so that they can serve in their chosen vocations in the church, community, or society.  Also the programs in the College of General Studies provide a foundation that prepares students for graduate or advanced study.  Many of the Regions University graduates of the College of General Studies choose to continue their studies at the Regions University School of Human Services or the Regions University Turner School of Theology.

Additionally, the University provides a program of continuing education, through the Regions University School of Continuing Education, for those who are not pursuing degrees.

### Purpose of the School of Human Services

The purpose of the School of Human Services is to prepare students for careers and professions that are dedicated to providing support and services for the well-being of individuals, family, church, and society in the spirit of Christian services.  This purpose will be accomplished by providing students with an interdisciplinary learning and serving experience with core courses and focused knowledge and skills in several disciplines that include, but will not be limited to, family therapy, business, and human communications.   Degrees offered include the Master of Science in Pastoral Counseling, Master of Science in Ministerial Leadership, Master of Arts in Marriage and Family Therapy, Master of Arts in Professional Counseling, Master of Divinity in Marriage and Family Therapy, Master of Divinity in Professional Counseling, Master of Divinity in Pastoral Counseling, Master of Divinity in Ministerial Leadership, Doctor of Ministry in Family Therapy I, Doctor of Ministry in Family Therapy II, Doctor of Philosophy in Marriage and Family Therapy, and Doctor of Philosophy in Professional Counseling.

Additionally, the University provides a program of continuing education, through the Regions University School of Continuing Education, for those who are not pursuing degrees.

### Purpose of the Turner School of Theology

The Regions University Board of Regents chartered the Turner School of Theology in 1999 in profound appreciation of Rex and Opal Turner, founders of the University. The Board deemed it appropriate to establish a School of Theology in their name to honor and recognize the personal labors and sacrifices made by Rex and Opal Turner for the cause of Christ.  Dr. Rex Turner, Sr. was an avid student of the word of God and well known for his biblical scholarship, administrative acumen, tireless efforts, and commitment to training church leaders, ministers, and Bible teachers for a world that needs Christ.

The purpose of the Turner School of Theology is to provide for the educational development of qualified persons to be effective Christian ministers, church leaders, teachers, and scholars who will use their gifts and knowledge in proclaiming the gospel, strengthening the church, and serving humanity. To accomplish this purpose, the School seeks to prepare students for the ministerial and teaching professions and for effective voluntary Christian service through both academic and practical studies on the graduate level.  The programs of instruction are biblical in orientation, scholarly in intellectual preparation, and relevant to contemporary life in application.   These programs include a strong emphasis in biblical studies, supported by studies in such fields as biblical languages, church history, systematic theology, homiletics and communication, religious education, professional ministerial studies, and missiology.

Degrees offered include the Master of Arts in Biblical Studies, Master of Arts in Practical Theology, Master of Divinity, Doctor of Ministry, and the Doctor of Philosophy in Biblical Studies.

Additionally, the University provides a program of continuing education, through the Regions University School of Continuing Education, for those who are not pursuing degrees.

## Purpose of the School of Continuing Education

The purpose of the School of Continuing Education is to provide participating students with quality and timely continuing education experiences for professional development and life enrichment purposes. These programs will be developed and presented by faculty and specialists related to programs and offerings provided by Regions University as well as for professionals and other individuals in areas of interest to the Regions University community and communities served.

## INSTITUTIONAL GOALS

Regions University has a history of providing its students with quality education and teaching excellence. By virtue of this history and its focused mission, Regions University strives to continue this tradition through the adoption and implementation of holistic educational and institutional goals. The institutional goals are student-centered and are directly related to the University's mission to prepare men and women, through a commitment to academic excellence and spiritual vitality at the undergraduate and graduate levels, for a lifetime of learning, leadership, and service to the professions, society, and family. Also, these goals are designed to help ensure the provision of quality programs and services which will help lead to the stability and continued growth of the University so that it can continue to meet its educational goals.

- Regions University will attract, retain, and contribute to the continued professional development of faculty dedicated to providing quality teaching and active scholarship and committed to the mission and purposes of the University.

- Regions University will maintain and develop facilities and learning environments, which are conducive to the learning process.

- Regions University will develop and implement careful planning and continuous study of the University's mission, purpose, goals, procedures, and programs as well as an analysis of the evaluation process in the interest of continuous quality improvement of its programs and services.

## A POSITIVE BIBLICAL FAITH

In accordance with its stated purpose and its concern for truth, Regions University is firmly committed to furthering the teaching and practice of Christianity. The University presents fairly all significant viewpoints on major issues and promotes freedom of inquiry. However, certain key positions are firmly established by Biblical evidence, and we believe should be upheld. Between 30–40% of Regions University's student body are from various religious faiths. Students are free to formulate individual positions. No one is required to sign a creedal statement of belief. Regions University is happy to have students from various religious backgrounds enrolled in its courses.

The University's understanding of the Christian religion includes the following tenets about its source of authority, central doctrines, polity and worship of the church, and the conduct of the Christian life.

Both the Old and New Testaments have been given by divine revelation and are the standard of authority in religious matters.

The Old Testament prepared the way for Christ, and the New Testament fulfills and supersedes it, making the New Testament the final authority for those who have lived since Christ's death on the cross.

There is one God, who is the creator and sustainer of the universe and who takes a direct interest in every human being. The Godhead consists of God the Father; Christ the Son; and the Holy Spirit, the Comforter. Christ was born of a virgin, died on the cross to make atonement for man's sins, arose bodily from the tomb, and ascended into heaven, where he presently reigns. There is a heaven to be enjoyed by the faithful and a hell to be endured by the disobedient.

God created all people with a need for fellowship with him and the ability to choose to obey his commands. Man cannot earn salvation from sin but can qualify to receive it as a gift of grace through submission to the will of God. The scripturally appointed means for receiving this gift is faith in Christ, repentance, confession of faith, and baptism (immersion). The transformation in character, conduct, and relationship with God that man experiences in this process is the new birth (regeneration). Christians are expected to live in accordance with the teachings of the New Testament.

Christ established the church for the mutual encouragement, instruction, and assistance of Christians and for the evangelization of the world through the proclamation of His gospel. Jesus prayed for unity among his disciples and commanded love for one another as the means to maintain it. The church was originally organized so that, once the apostles passed away, individual congregations would be independent of any central human authority and would be guided solely by the unchanging standard of Scripture. Congregations are to be bound together by common purpose and cooperative effort.

Each congregation is to assemble for worship on every first day of the week according to the teachings of the New Testament. In contrast to the elaborate temple ritual of the Old Testament, worship in the Christian age is to be in spirit and truth. Accordingly, the worship of the New Testament church consists of teaching God's word, offering prayers and thanksgiving from the heart, singing praise to God and encouragement to one another with the human voice, voluntary giving as a means of expressing appreciation to God for his blessings and sharing them with others, and partaking of the Lord's Supper in commemoration of Christ's death. Genuine charismatic gifts, such as prophecy, speaking in foreign languages, and miraculous healing, were exercised in the first century but not perpetuated afterward.

On the basis of principles established at creation, the New Testament assigns roles of leadership in public worship and supervision of the local congregation to male Christians. The scriptural organization of the local congregation consists of a plurality of elders (also called bishops or shepherds), who have oversight of the church; deacons, who assist the elders in ministering to the needs of members; and evangelists, who proclaim the gospel and teach under the authority of the elders. The offices of apostle and prophet ended with the passing of the miraculous age of charismatic gifts. Women are a powerful force in the church through the influence of their character and spiritual insights and through their efforts in teaching other women and children, helping the needy, and engaging in personal evangelism.

Christianity as taught by Christ and the apostles provides for the needs of the individual, the family, and society. An understanding of God's sacrificial love enables each person to recognize his worth and potential in the sight of God, relieves his guilt and anxiety, and motivates him to conduct his life according to the highest standards. The example of Christ fosters humility, submission to authority, and service to others. Through its teaching, its communal worship, its fellowship, and its mission of evangelism and benevolence, the church strengthens both individuals and families and has a strong impact for good wherever its efforts and influence reach. [Written by Lawrence E. Barclay, Faculty Member, the Regions University Turner School of Theology]

Note: Regions University is an academic institution, not a church. Bible at Regions University are not worship or devotional services, but an educational environment for interaction between student and teacher.

Regions University is accredited by the Commission on Colleges of the Southern Association of Colleges and Schools (1866 Southern Lane, Decatur, Georgia 30033-4097; Telephone number 404.679.4501) to award Associate of Arts, Bachelor of Arts, Bachelor of Science, Master of Arts, Master of Science, Master of Divinity, Doctor of Ministry, and Doctor of Philosophy degrees.

# EXHIBIT A

*[Several lines of faded, illegible text]*

In a message dated 4/8/2004 2:20:04 PM Eastern Daylight Time, wayneperry@southernchristian.edu writes:

Joan

Before I go any further, let me say that your husband's even considering taking things to an attorney, without using all the available SCU processes, creates a very oppositional atmosphere. I know you said you are "not ready to go that route." Even so, just the prospect of a potential lawsuit, regardless of who "wins" (in reality, only the lawyers win at these "games"), means I must approach my every email to you from this point forward in the knowledge that anything I write can be used against me and against SCU.

I have attempted to be as helpful to you as I possibly can be. I will attempt to do so again. There are two questions you need to answer before we can even discuss your registering for FT7370 MFT Practicum this Summer: a) are you already a student member of AAMFT and b) do you already have your proof of malpractice insurance? Unless you can answer yes to both questions, you should probably forget Practicum this summer and work toward making that happen this fall. While strictly speaking being a student member of AAMFT is not a requirement, it is the easiest and cheapest way to get the required malpractice insurance. If you can obtain the insurance through some other means, that's up to you. We just specify that you must carry at least $1 million liability (the minimum for what AAMFT's carrier will write the policy) and that the policy must be in force before you can see clients.

Now assuming you have the required insurance, let me respond to your questions. Yes, I am saying that a LMFT can supervise you IF that person agrees to take the

# EXHIBIT B

Dear John:

[text illegible]

**In a message dated 6/8/2004 1:51:23 AM Eastern Daylight Time, johnwhite@southernchristian.edu writes:**

> Butch:
>
> Please give me a call first thing in the morning about this item -- I will bring you up-to-date on this student, etc.
>
>
> John

# EXHIBIT C

**Subj:** **Head Start**
**Date:** 1/8/2005
**To:** johnwhite@southernchristian.edu

Dear John:

I have now left that woman, Liz Donnelan, at Head Start in New Britain, several messages. One the week before Christmas. One the week of vacation. And one this week. She has yet to return a single phone call. This is basically the same wall I have been up against the entire year.

My supervisor and I are working on another avenue to get clients. I will let you know more about as I can. But it will require me having to move to another state possibly.

Joani

# EXHIBIT D

Subj:       SCU and my Clinical Training
Date:       4/1/2005
To:         j.Allen@scscccc.org
BCC:        darin'yon.1@comcast.net

Dear Jack:

This is Joan T. Kloth, the woman who is having a problem finding a clinical training site because her school, Southern Christian University, refused to help her, this until I contacted you. Even after contacting you, the help has been useless. Though Dr. Perry did make one phone call to a place, that did not materialize into anything. I continued to make more contacts on my own still with no luck. I then contacted you back and this time John White from my school contacted me and supposedly was working to help me. He made one phone call and passed their information onto me. I tried three separate weeks in a row to contact the person that Mr. White referred me to and supposedly talked to. She never returned a single phone call. I have now exhausted every avenue in my state. I have gone so far out of the box that there is no box left. I have contacted people via fax, us mail, email, phone as well as physically walking into places. My list of contacts are in excess of 120 different sites, people and places including and not limited to agencies, counseling centers, hospitals, private practice counselors, doctors, lawyers, courts, judges, senior centers, social services, even the director of the Family Court Support Services and still nothing.

I have had to now move to Delaware to attempt to find a clinical site there. But again, my school will have nothing to do with helping me. I have not even heard from John White in months. Even in Delaware I am having a horrific time, forget about the fact that the expense of living part-time in Delaware and part-time in CT is draining my husband and I financially, emotionally and physically.

I am now over $50k in debt because of this. I have only two classes left to complete the first of my dual degrees. If I try to transfer to another school I will not only loose the majority of my classes, but will incur even more financial stress and debt.

I do not know what to do anymore. It has been suggested that I sue my school because all of the other schools that run Masters programs in Counseling help their students find clinical sites. In fact, it is part of those schools responsibility to make sure their students find a clinical setting to work in.

I am not even sure there is much that you can do but if you can come up with some suggestions or tell me how I explain to the US states Government who backed all of my student loans that I cannot pay them back as I cannot complete my degree, I would appreciate it. As it stands, I will be forced to default on my student loans because my school failed to provide me with a complete education that included all the eliminates that would assist me in finishing my degree.

And just to clarify and at least give the school some credit, they are just now investigating into the problem of clinical training, but it is a little too late for me.

Best regards,

Joani T. Kloth

Subj:     **SCU and my Clinical Training**
Date:     4/1/2005
To:       JAllen@ssc-ccc.org
BCC:      darinlyon1@comcast.net

Dear Jack:
This is Joan T. Kloth, the woman who is having a problem finding a clinical training site because her school, Southern Christian University, refused to help her, this until I contacted you. Even after contacting you, the help has been useless. Though Dr. Perry did make one phone call to a place, that did not materialize into anything. I continued to make more contacts on my own still with no luck. I then contacted you back and this time John White from my school contacted me and supposedly was working to help me. He made one phone call and passed their information onto me. I tried three separate weeks in a row to contact the person that Mr. White referred me to and supposedly talked to. She never returned a single phone call. I have now exhausted every avenue in my state. I have gone so far out of the box that there is no box left. I have contacted people via fax, us mail, email, phone as well as physically walking into places. My list of contacts are in excess of 120 different sites, people and places including and not limited to agencies, counseling centers, hospitals, private practice counselors, doctors, lawyers, courts, judges, senior centers, social services, even the director of the Family Court Support Services and still nothing.

I have had to now move to Delaware to attempt to find a clinical site there. But again, my school will have nothing to do with helping me. I have not even heard from John White in months. Even in Delaware I am having a horrific time, forget about the fact that the expense of living part-time in Delaware and part-time in CT is draining my husband and I financially, emotionally and physically.

I am now over $50k in debt because of this. I have only two classes left to complete the first of my dual degrees. If I try to transfer to another school I will not only loose the majority of my classes, but will incur even more financial stress and debt.

I do not know what to do anymore. It has been suggested that I sue my school because all of the other schools that run Masters programs in Counseling help their students find clinical sites. In fact, it is part of those schools responsibility to make sure their students find a clinical setting to work in.

I am not even sure there is much that you can do but if you can come up with some suggestions or tell me how I explain to the US states Government who backed all of my student loans that I cannot pay them back as I cannot complete my degree, I would appreciate it. As it stands, I will be forced to default on my student loans because my school failed to provide me with a complete education that included all the eliminates that would assist me in finishing my degree.

And just to clarify and at least give the school some credit, they are just now investigating into the problem of clinical training, but it is a little too late for me.

Best regards,

Joani T. Kloth

# EXHIBIT E

**Subj:**   (no subject)
**Date:**   4/15/2005
**To:**     wayneperry@southernchristian.edu
**BCC:**    JAllen@sacscoc.org

Dear Dr. Perry:

The best I can do to get these hours to you in time is fax. If you do not accept them, I will be forced to file a complaint because it is bad enough that the school refused to assist me in finding a clinical training site, which forced me to move my daughter and I away from my husband to an entirely new state some 4 hours away, just to have to start my search all over for a clinical site. I now no longer have access to a printer and fax is even more difficult from the place I am now living.

These forms are signed by my instructor but there is not much more I can do with them than send them via a fax when I finally return to CT sometimes next week. My husband is NOT computer literate and so asking him to try to pull this up from my computer and fax it to you is difficult enough. If he can do it tonight he will try.

Best regards,

Joan T. Kloth

# EXHIBIT F

Dear Ms. Balford:
As I now live between Delaware and CT, going to AL would be out of
the question both financially and as a mother. We will have to
schedule a telephone conversation and I will need a written
transcript of this conversation after it is completed. It is best to
contact me in the Morning after 9am. Please let me know what day
so I can make arrangements to be available. You will also need to
contact me by mobile phone at 203-770-0318.
Regards,
Joani Kloth

In a message dated 8/19/05 7:42:27 PM, balford@graceba.net
writes:


Mrs. Kloth—the Appeals Committee would like to schedule a
hearing on your appeal. Although it is not required for students to
speak with the Committee, they are invited to do so if they choose.
If this is your preference, you are invited to meet with us in person
in Montgomery, or we will arrange a telephone connection for you.

Please provide us with several (at least three) days and times that
would be convenient for you to participate. We will crosscheck
these with the Committee members to see when we will be able to
get the group together. Send your selections to me via return e-
mail to balford@graceba.net

We would like to schedule the meeting for the mid- to latter-part of
next week. However, if this is not a good time for you, please
suggest an alternate schedule.

Barbara Alford

# EXHIBIT G

Dear Judge Robinson:

As to Exhibit G, I contacted the phone company on such and such a day and they advised me they would provide the requested information. However, I have not yet received it but will provide it immediately upon receipt from the phone company.

Regards,
Joani T. Kloth, pro-se

# EXHIBIT H

Paid
CK# 1720
9-6-05

# STATEMENT

FROM:   RONNIE BIANCOSINO
17-H GLEN CREEK CIRCLE
ELKTON, MD 21921
(302) 559-4251

TO:   Kloth

| DATE | TIME | AMOUNT |
|------|------|--------|
| 8/19 | LAST BILL | 160 |
| 8/24 | 50 | 50 |
| 8/25 | PAYMENT | (160) |
| 8/29 | 50 | 50 |
| 8/31 | 50 | 50 |
| 9/6 | 35 | 35 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

TOTAL AMOUNT:   $185 —

## PLEASE FEEL FREE TO SEND PAYMENTS BY MAIL

# EXHIBIT I

```
 1   finally decided, Well, let me give it a shot.

 2   And I'll try going down.  I can't find anything

 3   in New York.  I can't find anything in

 4   Connecticut.  And New Jersey was kind of out of

 5   the question.  It was too expensive to go there.

 6   I said let me try Delaware.  So I moved me and my

 7   daughter to Newark, Delaware.  I put my daughter

 8   in -- I'm sorry.  I put my daughter into home

 9   schooling so that she could continue to do with

10   her program what she was working on.  And I

11   started looking for clinical training sites down

12   here.

13           I contacted I don't know how many

14   places.  I finally got somebody who was willing

15   to be honest with me and tell me what the problem

16   was.  And in her case, the problem was -- and she

17   was very impressed with my resume -- with my

18   information.  She was very impressed with the

19   work I had done.  She was even further impressed

20   with my intelligence and my ability to put

21   together an entire program to help children and

22   families of high-conflict divorce.  She said to

23   me that the problem is, I run a facility.  I am
```

# EXHIBIT J

APPEALS COMMITTEE (Joan Kloth) - 8/24/05

1   was a big problem.  The only people that didn't

2   have a problem finding a clinical site were those

3   who are pastors working in a church and those

4   down in Alabama right by you.

5           DR. ALFORD:  Well, Mrs. Kloth, thank

6   you for your time.  We will get in touch of you.

7   Someone at the institution will get in touch with

8   you about procedures for you to get a transcript

9   of the testimony, both of the institution's record

10  and your record as well.

11          MRS. KLOTH:  I also will be passing

12  it out to my attorney because we're looking to

13  file a major lawsuit.

14          DR. ALFORD:  We understand that is

15  your right.

16          MRS. KLOTH:  Yep.

17          DR. ALFORD:  Thank you very much.

18          MRS. KLOTH:  Bye-bye.

19

20          (Whereupon on Wednesday, August

21          24, 2005, the Appeals Committee

22          Telephone Meeting was

23          adjourned)

# EXHIBIT K

aolrich://104179110321/

Subj:    **Fwd: Southern Christian University**
Date:    Friday, August 26, 2005 10:46:38 PM
From:    Putzangel
To:      Putzangel

Subj:    **Re: Southern Christian University**
Date:    Friday, August 26, 2005 10:32:52 PM
From:    Putzangel
To:      balford@graceba.net

And you can let the Appeals Committee know that they had to be kidding if they really thought I expected them to find in my favor as it would be a financial disaster and set a precidence. That is why I will probably be forced to file a lawsuit to make sure this school is shut down for good. I was only going through the motions so I could say I did everything that I was supposed to do.   Now, they just screwed themselves and the school because in attorney's fees alone it will cost them more than the damages they could have assumed during the appeals meetings. Good luck. You will need it as I have all the evidence I need in emails, classmate confessions, school records and legal government statements. They just might want to think twice about what they are going to do because I will make sure that I shut them down and they pay for all the damages I am incurring becuase of their failure to provide me with a complete education.
Joani

In a message dated 8/26/05 3:36:56 PM, balford@graceba.net writes:


Mrs. Kloth—The Southern Christian University Appeals Committee met on August 24th and voted to deny your request that the University assume the costs of your student loan and potential wages for the past three years.  You will receive reaffirmation of this decision via mail, to the address on file in our official records (320 North George's Hill Road, Southbury, CT 06488.)

The letter informs appellants of the next and final level of appeal available to them at the University. However, since you indicated during Wednesday's meeting that you intend to rebut statements made during the session, I have excerpted that portion of the letter for you, below:

From the SCU Catalog: "If the Appellant disagrees with the decision of the PRT Appeals Committee, then he or she may appeal the decision to the SCU Executive Leadership Team.  The Appeal shall be submitted in writing, within fifteen (15) calendar days of receipt of the PRT Appeals Committee decision, indicating why the Appellant disagrees with the decision. The written Appeal shall be sent to the Executive Leadership Team in one of the following manners:
     By email (preferred) to:  JOHNWHITE@SOUTHERNCHRISTIAN.EDU

     By fax:  334.387.3878 – to the attention of Dr. John H. White

     By U.S. Postal Service or hand delivery:
          Dr. John H. White
          Southern Christian University
          1200 Taylor Road
          Montgomery, AL  36117-3553"

In addition, you had requested a transcript of the session.  The earliest that the transcription service will be able to take the taped copy will be Monday, August 29th, and they have indicated that the work will take approximately one week.  While we cannot control their timetable, we assure you that your copy will

aolrich://10417911032/

be in the mail to you within one day of the receipt of the printed transcript by SCU. And invoice for the cost of your copy will be included in the mailing.

Barbara Alford, Ed.D.

# EXHIBIT L

Thank you for using the Better Business Bureau's Online Complaint System.
Your complaint has been assigned case # 85002013.
A confirmation will be emailed to : putzangel@aol.com
Please print a copy of this for your records.

Filed on : August 31 2005

Filed by :
Joan Kloth
320 North George's Hill Road
Southbury CT 06488

Filed against :
Southern Christian University
1200 Taylor Road
Montgomery AL 36117–3553

Complaint Description:
SCU failed to provide a complete education in my process to complete my masters degree in MFT and PC. They refused to assist me in finding a clinical training site which is like a med student without a residency. They failed to inform the students that finding a site was soley their responsibility and that it would also be very very difficult. They also stated they would be COAMFTE certified by the time I graduated and 1.5 years into my schooling they reneged . on this promise. I have this in writing about their promise to be COAMFTE Certified. In addition, I spent over 2 years making over 100 contacts including moving my daughter and I part–time to another state to find a clinical site. What I finally found out is that because my school refuses to create a personal rapport with anyone, no one will take me on as a student for clinical training. The school has left me with no ability to complete my degree and $58,000 in student loan debt for a degree I cannot complete. I am also a straight A student.

Your Desired Resolution:
I want the entire amount of my student loan paid for by the school and damages for the loss of income during the 3 years I wasted going to their school as well as the emotional turmoil I am now

faced with because I have no substantial way of earning an income after three years of education.

This case will be reviewed by a complaint specialist at the Better Business Bureau, and then forwarded to the business for their response. It is our policy to allow the business 30 working days to respond to your complaint. You will be notified when the business has responded.

What would you like to do next?
View the status of your complaint
Return to the BBB Homepage

# EXHIBIT M

COMPLAINT FORM
Southern Association of Colleges and Schools (SACSCOC)

1. COMPLAINANT INFORMATION

A.    Joan T. Kloth

B.    320 North George's Hill Road

C.    Southbury, CT 06488

D.    203–267–7801 home; 203–267–7802 fax

E.    putzangel@aol.com

F.    Southern Christian University (SCU)

G.    Student

H.    Enrolled but had to put on hold as I have no more classes left
      but my clinical training which I have been unable to get.

2. COMPLAINT INFORMATION

A.    SCU did not provide a complete education by refusing to
      to assist me in the obtaining of a clinical training site despite
      numerous requests for 2.5 years and making 100's of
      contacts from CT to DE.  As well, the school lied to me about
      being COAMFTE certified by the time I would graduate.

B.    I investigated into SCU and was sent a letter stating that the
      school was applying for it's COAMFTE certification and that by
      June of 2005, when I was to graduate with a dual masters that
      they would be certified.  This letter came from Marvin Cox and
      I have a copy of it but not with me here in DE.  When I was
      into my second semester in my program, I realized that at the
      pace I was taking classes I need to arrange for a clinical site as
      it would come up rather quickly.  At about the same time, I
      was informed by another student that the school was no
      longer attempting to become COAMFTE certified and that it
      would just mean I had to provide my state instead with all
      sorts of documentation on all the classes I took at their school

toward my degree. I was mad but it was already too late to transfer as I had accumulated way to many credits and it would have been a financial burden in lost college credits for me to switch schools. So instead, I focused on the issue of my clinical training site. I began to look for sites, writing letters, emails, making phone calls, and physically walking into sites. At about 30 negative contacts, I wrote to Dr. Perry, the instructor for this particular course and advised him that I was having difficulty finding a site. He informed me that it was the students sole responsibility to find a site. When I got to 50 negative contacts, I advised him of this again. He still refused to assist me. I then contacted Jack Allen at your agency. He contacted the school and then Dr. Perry contacted me by email requesting my list of contacted sites. He made one phone call and told me to contact this person, Robin. I contacted her several times but she never responded. I reported this back to Dr. Perry who contacted her back. I tried contacting her again only to be told that they do not work with students outside of CT and that she had no openings anyway. I reported this back to Dr. Perry, but he never responded nor attempted to make any more contacts on my behalf. I continued to make contacts. At 75 negative responses, I again contacted Dr. Perry, who again refused to assist me. I then contacted Jack Allen again. He called the school and I got a phone call from John White. John White made one phone call to a head start program and told me to call them. I left three separate messages and never got a return phone call. I informed of this several times but never heard back from him after the 3rd contact by me with no response from Head-start. I then contacted Jack Allen again and again and again. I repeatedly contacted Dr. Perry with still the same response. By this point, I had barely any classes left to take and had to start taking my clinical trainings classes with or without a site. I found one women who offered to supervise me but she could not provide me with any clients. I would have to find clients on my own. So I began contacting doctors, lawyers, judges, caseworkers, GALS, hospitals, daycare centers, senior centers and so on for private clients. No one was interested or they claimed there were liability issues, etc. Finally, a few friends and acquaintances offered to allow me to use them as guinea pigs temporarily so that I could at least do the class work. This

went on for two semesters of clinical classes and still no clinical site. By the summer of 2005, I had only two classes left to take, besides the my last clinical training class. Since I could not find a site in my home state of CT, I decided to try moving to Delaware. In March, I moved my daughter and I to Delaware. She was would be homeschooled my daughter so I could try to get a site in DE. I spent the summer completing these two classes and still looking for a site. During this time, I made many contacts but only went on one interview. It was at this interview that the woman was nice enough to tell me the truth as to why I was not able to get a site. She said it was because my school refused to create a personal rapport with the sites and only used email to communicate. And there were issues with the resume my school okayed for me to use. My husband and I had only allotted for me to be out of work for 2 to 2.5 years to get my Masters. It was now going on over 3 years and I still did not have a site and I had no more classes to take. I repeatedly was telling Dr. Perry and all my professors this and begging them for help.

Without my clinical training, I cannot get my degree. Without my degree I cannot do my internship. Without my internship, I cannot sit for m licensing test and get my license. Without this, I cannot get a job to pay off the $58,000 I now have accumulated in student loans. Not only is this beyond what I was supposed to spend because I had to extend my education a full semester plus school fees because of my inability to obtain support from the school to get a clinical training site, but I am now financially devastated in school loans for a degree that I cannot get.

C.    I contacted the school repeatedly and complained. It was not until this summer that they told me I could file a grieve complaint. I filed it and an conference call style appeals and grievance hearing was held. It was only myself and the committee which is made up of all school employees and officials. Neither Dr. Perry or Dr. White was involved in this conference. They just submitted some written arguments that the committee never sent on to me to review and still has not sent to me. I knew it was a lost cause as there was no way that the school was going to agree to pay all my students loans back that they stuck me with because they refused to

assist me with finding a clinical training site.  I requested a
copy of the comments from Dr. Perry and Dr. White so I could
rebuttal their comments as I did not have a chance to review
them prior to the hearing.  Instead they sent me a copy of the
transcripts and tried to bill me $80 for them.

☒  I have read the "Complaint Procedures for the Commission or
Its Accredited Institutions" and agree this form constitutes my
formal complaint.

☒  As stated in the Commission on Colleges' Complaint Policy, I
understand that the Commission: (1) does not intervene in the
internal procedures of institutions or perform as a regulatory
body, (2) is not a formal adjudicatory or grievance-resolving
body, and (3) will not serve as a grievance panel when the
outcome of an institutional grievance or process is
unsatisfactory to the complainant.

☒  I authorize the commission on Colleges to submit my
complaint and/or any documents concerning my complaint to
the involved institution(s).

☒  I hereby certify that all of the information I have given above
is true and complete to the best of my knowledge.

September 28, 2005

Joan T. Kloth

# EXHIBIT N

Oct. 27, 2005
Never heard
from them.

Dear Ms. Joan Kloth:

This is to inform you that we have sent your complaint to the President of Southern Christian University and he is required to respond to SACS within a month. When we receive his response we will contact you.

Sincerely,
Cecile Hadgu
Commission on Colleges
Southern Association of Colleges and Schools
1866 Southern Lane, Decatur, GA 30033
404-679-4501, Ext. 523
800-248-7701, Ext. 523
404-679-4558 - FAX
chadgu@sacscoc.org

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# EXHIBIT O



.PPK-2 Rev 12/03

## CONSUMER STATEMENT
### STATE OF CONNECTICUT
### DEPARTMENT OF CONSUMER PROTECTION
165 Capitol Avenue  Hartford CT 06106
E-Mail:  trade.practices@po.state.ct.us
Fax No.  (860) 713-7239

1. Return form to Agency at address show above
2. Type or print CLEARLY

For Official Use Only

| YOUR NAME | HOME PHONE (Include Area Code) | BUSINESS PHONE (Include Area Code) | | ARE YOU 65 OR OLDER? ☐ YES  X NO |
|---|---|---|---|---|
| Joan Kloth | 203-267-7801 | 203-770-0318 | | |
| STREET ADDRESS | CITY | STATE | ZIP CODE | E-MAIL |
| 120 North George's Hill Road | Southbury | CT | 06488 | potzangel@aol.com |
| PARTY/COMPANY COMPLAINED AGAINST | PERSON DEALT WITH / TELEPHONE NUMBER (Include Area Code) | | | POSITION |
| Southern Christian University | Dr. Wayne Perry, Dr. John White and the entire school: 800-351-4040 | | | Graduate Educational Providers |
| STREET ADDRESS | CITY | STATE | ZIP CODE | E-MAIL |
| 1200 Taylor Road | Montgomery | AL | 36117-3553 | www.southernchristian.edu |
| INFORMATION:  WAS A CONTRACT INVOLVED  X YES    NO | IF "YES", ENTER DATE December 2002 | TYPE OF CONTRACT: ☐ ORAL    X WRITTEN | | PRODUCT OR SERVICE INVOLVED Graduate Degree |
| DATE PURCHASED On-going educational expense | COST $58,000 | HOW PAID (CIRCLE ONE) CASH         CREDIT CARD      INSTALLMENT CONTRACT    LAW-AWAY (Student Loans) | | |
| WAS THE PRODUCT OR SERVICE AVERTISED X YES    ☐ NO | HOW? Every possible way imaginable | DATE & PLACE OF AD (PLEASE ATTACH COPY IF POSSIBLE) Constantly advertised on line, newspapers and various other sources on a regular basis | | |
| HAVE YOU CONTACTED THE COMPANY REGARDING YOUR COMPLAINT?    X YES    ☐ NO | IF "YES" ENTER DATE Jan. 19, 2005, and for months previous to this date | PERSON CONTACTED Customer Service | | POSITION |
| HAVE YOU HIRED AN ATTORNEY ☐ YES    X NO | IF "YES", NAME | IS COURT ACTION PENDING? ☐ YES    X NO | | IF "YES", IN WHAT COURT? |

NOTE: Home Improvement and New Home Contractor complaints require a copy of your contract and copies of the back and front of the cancelled checks. Otherwise, **DO NOT** send any other paperwork or documentation with your complaint at this time.  If further documentation is needed you will be notified.  We will not be able to return or forward any material sent to this department. Please provide a **detailed** statement regarding the facts of your complaint below.  We encourage consumers to try and resolve their issues with the company involved.  More information can be obtained from our website: www.state.ct.us/dcp.  You may also find information on the Small Claims Court and Superior Court process at www.jud.state.ct.us.

SCU failed to provide a complete graduate education despite repeated requests for assistance to help me find a clinical training site.  This is a breach of implied contract.  The school states that it is the student's responsibility to find a clinical training site.  I have spent over 2.5 years making hundreds of contacts for a clinical training site, including having to move and live part-time in Delaware to try to find a clinical training site.  Thus I have found site after site, but because of my school was unable to get a clinical training.  Once in Delaware, I found the truth about why no one would allow me to do my clinical training with them.  It was because my school refused to create a personal rapport other than by email and this was limited at that.  The school will claim that they got me two clinical sites.  Yet, they will not tell me the names of them.  What they did was after I reported them several times to the Certification Board of Southern Association of Colleges and Schools Commission on Colleges, they grudgingly called two places on the lists of contacts that I had created.  The first incident of this was with Dr. Perry who told me to contact Robin.  I contacted her at least three times.  But she never returned my contacts.  I informed Dr. Perry of this who contacted her again and then instructed me to try to reach her again. When I finally got in touch with her, she told me that she had no opening for clinical students and that besides that she does not take students from colleges outside of Connecticut.  I then continued to contact more people, including judges, attorneys, daycares, churches, temples, physicians and so on.  When I got to about 100 contacts, I then reported them again to SACSCOC.  This time Dr. John White contacted me for my list.  He made one call to a headstart program and told me to call them.  I called them no less than three times but they never returned my calls.  I informed Dr. White of this and I never heard from him again about it.

I have since filed for an appeals hearing through the school. I requested that they pay back the $58,000 for the student loans I incurred for the degree through their school that I am unable to obtain because I could not get a clinical training site. Neither Dr. Perry or Dr. White were present at the teleconferenced Appeal Hearing. The hearing members consisted entirely by employees of SCU. They read off commentaries from Dr. Perry and Dr. White. When I asked for a copy of their statements, the school sent me a copy of the transcripts of the session instead and tried to charge me $80. Obviously, they were not going to find in my favor or even assist me in getting my degree any longer.

In addition, the school is now harassing the one person who tried to help me out with my clinical training. She volunteered to temporarily supervise me on the few private clients who offered to be guinea pigs so that I could at least have someone to practice my clinical skills upon. She did this out of the goodness of her heart because she felt so bad about this supposedly Christian school who was refusing to help me complete my degree.

At this point I have $58,000 in student loans for a degree that I can never complete because of my school. In addition, even if I found a site today to do my training, the school has drained us dry by forcing me to extend my education an extra year while I begged, crawled and did every thing I could to find a clinical training site. As well, the school would refuse to continue to educate me anyway because I have had to report them so many times, including to the Department of Education. As for transferring to another school, I have completed all of my classes except for the clinical training. I have a GPA of 3.9. But to transfer, I would loose everything because you are not allowed to transfer more than 9 to 12 credits. This would amount to starting all over again, loosing another 3 years and financially sinking us even further for classes and grades that I have already completed.

This has become a serious financial hardship and emotional strain on my family and I. I wasted 3 years going to school full-time for a degree that I cannot get. During those 3 years, I could have been establishing myself in the job market instead of incurring a $58,000 student loan debt that I cannot pay back for an degree I cannot receive.

Please help to make this right.
Regards,
Joan T. Kloth and her family




10-07-2005

_____
SIGNATURE                                    DATE

Attach as many additional pages as needed to complete your statement.

**Note: All complaints are public information. By submitting this complaint, you give the Department of Consumer Protection your permission to release a copy of this Consumer Statement.**



# STATE OF CONNECTICUT

*DEPARTMENT OF CONSUMER PROTECTION*



*Employment Rel*

**COPY**

8 7659-00

10/24/2005

JOAN T KLOTH
320 NORTH GEORGE'S HILL ROAD
SOUTHBURY, CT 06488

File #: 2005-6345
Re: SOUTHERN CHRISTIAN UNIVERSITY

Dear JOAN T KLOTH:

I wish to acknowledge receipt of your correspondence concerning the above referenced company and to thank you for thinking of this office in connection with this matter. However, the nature of your complaint appears to fall under the jurisdiction of:

> Consumer Affairs Section
> Office of the Attorney General
> 11 South Union Street
> Montgomery, AL 36130
> (334) 242-7335

By copy of this letter, I have taken the liberty of forwarding your correspondence to the above agency. Please contact that agency directly if you have any questions or concerns regarding your complaint, and again, thank you for contacting this office.

Sincerely,

*Maria Doyle*

Maria Doyle
Trade Practices Division

CC: Ref. ALABAMA CONSUMER AFFAIRS
      FILE

Fifth, I wonder if you bothered to ask any of the other students if they had difficulty finding a clinical training site. As well, as contact back to the Tanya Lyons, whom I believe also contacted you about the very similar issues with her clinical training site.

Sixth, it is also unethical and illegal to tamper with and intimidate a witness. This is what Dr. Perry and the school has done with the one and only person who tried to help me with my clinical training situation. They are doing this because they know that ultimately I will have to sue them because I am stuck with $58,000 in student loans for a degree I can never get because I cannot get a clinical training site.

In light of this information, I respectful request that this case be escalated and appealed to the next level of investigation.

Best regards,

Joan T. Kloth

# Exhibit B

UNITED STATES DISTRICT COURT

AND FOR THE DISTRICT OF DELAWARE



CASE NO. 06-244-SLR

Joan T. Kloth                                    APPELLANT/PLAINTIFF

      Vs.

Southern Christian University;                   APPELLEE/DEFENDANTS
Board of Directors, et.al

### Motion for Reconsideration of Summary/Default Judgment

State of Delaware:
County of New Castle:
SS,

    I, Joan T. Kloth, Plaintiff, respectfully request the reconsideration of the dismissal of my case against Southern Christian University, now known as Regions University and hereafter referred to as SCU based on the following facts:

1) Defendant did not answer the original complaint in a timely fashion and as such should not have been allowed to file a Motion for Jurisdiction, outside of the legal time limits allowed by the District Court of Wilmington, DE (Possibly Rule 12). Plaintiff was only required by law to give the Defendant 20 days to answer the original complaint but waited 89 days before filing her Motion for Summary/Default Judgment. By the laws of DE, defendant was outside of the legal filing time by 2 months. Thus Jurisdiction should not have been an issue in this case, as it was filed in an untimely matter and thus only their untimely non-

1

answering of the original complaint should have been an issue, which they never did bring up either.

    a) On April 12, 2006, Plaintiff, Joan T. Kloth, filed a lawsuit against Southern Christian University and it's Board of Directors.

    b) On June 5, 2006, the Plaintiff filed for service of the lawsuit against the plaintiff in District Court, located at 844 North Kings Street in Wilmington, DE.

    c) On July 28' 2006, the Defendant was served with the lawsuit papers and accordingly had till August 17, 2006 to answer. At the very most, the courts would permit 30 days to answer. Rule:12 of the Civil Rules governing the court of District Court.

    d) It is now October 4, 2006. It is obvious that the defendant has no intention of filing a timely answer as a full 69 days has now transpired and no extension of time was requested.

    e) The defendant is neither an infant, child nor minor and is not incompetent, disabled or otherwise impaired.

    f) The relief requested is for the same amount of the amended lawsuit, which included all interest on the student loans and no more.

2) Furthermore, Appellant/Plaintiff paid the required tuition fees (amounting to approximately $59,000) via student loans in good faith and SCU accepted this tuition, which would indicate a contract between the school and the student whether it be in the actual classroom or via distance learning, which would include Internet participation, phone call, or attendance via the Internet. In addition, accreditation requires support structures and resources to allow for the total growth and development of its students to complement all school programs. In this case, the defendant failed to allow for this when it denied the Plaintiff desperately needed assistance in finding a clinical training site to complete her degree.

Wherefore Plaintiff requests the courts find in Plaintiffs favor for $2,060,000 plus all

other costs incurred and interest on student loans along with any other such relief as the

Court may deem the plaintiff is entitled to.

Respectfully submitted:

JOAN T. KLOTH
320 North George's Hill Road
Southbury, CT 06488
Pro-Se

9-20-07

4

## CERTIFICATION of MAILING

    This is to certify that a copy of the foregoing was sent on this _20_ day of _Sept_ , _____, 200_7_ to all defendants as follows:

Southern Christian University
And it's Board of Directors
C/O Kevin Goldstein
300 Delaware Ave, Suite 800
Wilmington, DE 19801

                                               Joan T. Kloth
                                               Plaintiff, Pro-Se

Klein
330 North George Hill
Southbury Ct. 06488

US. District court
844 North King St. 2 4200
Wilmington, DE 19801





UNITED STATES
POSTAL SERVICE

0000

19801

U.S. POSTAGE
EAST BERLIN.CT
06023
SEP 21 '07
AMOUNT
$0.34
0002897J-05

# EXHIBIT P

BDA

## STATE OF ALABAMA
## ATTORNEY GENERAL'S OFFICE
## CONSUMER AFFAIRS SECTION

11 South Union Street, 4th Floor
Montgomery, AL  36130

### BUSINESS REPLY FORM

(IT IS REQUESTED THAT ALL REPLIES TO THE COMPLAINTS BE SUBMITTED ON THIS FORM)

COMPLETE NAME OF FIRM:  <u>Southern Christian University</u>

PRINCIPAL OFFICE ADDRESS: <u>1200 Taylor Road, Montgomery, AL  36117-3553</u>

TELEPHONE NO: <u>(334) 387-3877</u>

CORPORATION: Name of President or General Manager <u>Dr. Rex A. Turner, Jr.</u>

PARTNERSHIP: Name of Partners <u>N/A</u>

SINGLE PROPRIETORSHIP: Name of Owner <u>N/A</u>

Name, address and telephone number of person to contact for additional information, if necessary:
<u>Jeff Foshee, Foshee & George, L.L.C., 900 S. Perry St., Montgomery, AL 36104 265-1960</u>

Name of Complainant: <u>Joan Kloth</u>

The complaint is True ( );  False (X);  Partially False ( )

COMENTS: (Use Additional Sheets if Necessary)

<u>Ms. Kloth's allegations are not accurate, and without any merit. Ms. Kloth</u>
<u>complains that the University did not help, or in her opinion sufficiently help,</u>
<u>her to find a clinical training site. As Ms. Kloth alludes to, it was, per</u>
<u>University written policy, the student's sole responsibility to find a suitable</u>
<u>site. Regardless, University officials voluntarily endeavored to assist her.</u>
<u>Thereafter, the student and her supposed clinical site supervisor submitted papers</u>
<u>indicating that, in fact, the complaining student received clinical training.</u>
<u>Moreover, the U.S. Department of Education has, per Ms. Kloth's request, already</u>
<u>investigated her complaint and found no merit to it.</u>

(A copy of this reply will be sent to the consumer.)

# EXHIBIT Q

aoirich://782876310:

Subj:      RE: SCU/ Southern Christian University
Date:      Tuesday, January 3, 2006 11:13:14 AM
From:      chadgu@sacscoc.org
To:        Putzangel@aol.com
.cc:       jallen@sacscoc.org

Dear Ms. Kloth: Thanks for your email. You will soon receive a response from this office.

Sincerely,
Cecilie Hadgu
Commission on Colleges
Southern Association of Colleges and Schools
1866 Southern Lane, Decatur, GA 30033
404-679-4501, Ext. 523
800-248-7701, Ext. 523
404-679-4558 - FAX
chadgu@sacscoc.org

---

**From:** Putzangel@aol.com [mailto:Putzangel@aol.com]
**Sent:** Sunday, January 01, 2006 10:40 AM
**To:** Cecille Hadgu; BACHIAPPA@aol.com; governor.Rell@po.state.ct.us
**Subject:** SCU/ Southern Christian University

Dear Ms. Hadgu:
I have tried to stay in contact with you concerning my situation with SCU/Southern Christian University. I have also contacted the Attorney Generals office in AL. Well, now it has gone from bad to worse.

Apparently, Dr. Perry continues to lie to everyone and worse has now intimidated and harassed my witness in this case. First of all, he repeatedly tries to state that the school voluntarily helped me to find a site. Not true. In fact, if you look at your own files through Jack Allen, you will see that I repeatedly contacted Jack and that once Jack finally contacted them, they then finally stepped forward. But this was on a limited step forward. The one and only time Dr. Perry helped was when he made one phone call which panned out to nothing. The person, Robin, I finally spoke to said that they not only do not work with students outside of CT schools but she had no place for me. The second time the school assisted me was after my repeated contacts to Jack Allen again. This time a John White made one phone call to a headstart program. That program refused to return my call and John White was told this on three seperate occassions.

Next, Dr. Perry claims that I found a clinical site. No, I did not. What I found was someone who would supervise any private clients I could come up with. In fact, this was the condition upon which she agreed to supervise me for free because she was in private practice. Anyone else who I contacted in private practice to supervise me wanted $100 to $180 per hour of supervised time.

It is this same person that Dr. Perry has now stated was not qualified to supervise me because she had forgotten to renew her license. Dr. Perry not only accepted her paperwork once to supervise me but two semesters in a row. In addition, is not Dr. Perry a licensed counselor who as my instructor was overseeing everything? Thus whether she had renewed her license or not, it was under the direction and supervision of Dr. Perry. Well, it gets better because though he claims I found a clinical site, he has also revoked all of my clinical hours that I did do with this woman with the few volunteers who offered to help me at least pass my classes as I could not find a clinical site to accept me or my school.

It is this same good samaritan who offered to supervise me for free when no one else would either supervise me or wanted to charge me $100 t o $180 per hour. I need over 600 hours of clinical counseling time which would have been more than we could have afforded, especially as a non-working

# EXHIBIT R



## SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS
# COMMISSION ON COLLEGES

1866 Southern Lane • Decatur, Georgia 30033-4097

Telephone 404/679-4500  Fax 404/679-4558

www.sacscoc.org

January 4, 2006

Ms. Joan T. Kloth
320 North George's Hill Road
Southbury, CT 06488

Dear Ms. Kloth:

We have reviewed your complaint against Southern Christian University and the response of the University to your complaint. You stated in your complaint that the institution refused to assist you in obtaining a clinical training site and that you were informed by the institution that the certification by the Commission on Accreditation for Marriage and Family Therapy Education (COAMFTE) for your master's program in Marriage and Family Therapy would be obtained by June 2005.   In connection with your complaint, we asked that the several issues below be addressed by the institution:

1.    Was there a stated policy when Ms. Kloth enrolled that students were responsible for obtaining their own clinical training sites?  If there was not, how has the institution attempted to obtain a site for Ms. Kloth?

2.    Did the institution inform her that COAMFTE certification would be obtained and was a date given whereby this would happen?

3.    Does the institution have a written policy that provides for evaluation and action on student complaints or grievances?  If so, has Ms. Kloth followed those procedures?

In regard to the first item, we find abundant evidence that students are informed early on of the responsibility to make their own clinical arrangements.  There are statements to that effect in the student handbook, the academic catalog, and the clinical training handbook and the requirements were covered in FT 6300, a course that was taken in your first semester at the institution.

Concerning the second item, we find that, although Marvin Cox at the institution informed you in 2001 that it was seeking accreditation by COAMFTE and expected it by "around 2005," the institution made no official claim to you that this would happen.  It seems that you were also aware, by the time of your second semester, that the institution was no longer seeking accreditation by COAMFTE.



Ms. Joan T. Kloth
Page Two
January 4, 2006

In regard to the third item, the institution does have a policy on grievances and allowed a grievance to be submitted by you after the normal deadline, but the subsequent decision of the Appeals Committee denying your request was not appealed by you to the Executive Leadership Team of the institution for a final decision.

Because we have decided that the complaints in items one and two do not represent significant non-compliance with the *Principles of Accreditation*, your complaint against Southern Christian University will not be processed further.

I hope that you are able to complete your educational goals in the future.

Sincerely,

Belle S. Wheelan, Ph.D.
President
Commission on Colleges

BSW/GJA:ch

cc:     Dr. G. Jack Allen

# EXHIBIT S

Joan T. Kloth
*320 North George's Hill Road*
Southbury, CT 06488
203-267-7801 home
203-770-0318 mobile

January 13, 2006

Barbara Wheelan
Southern Association of Colleges and Schools
Commission on Colleges
1866 Southern Lane
Decatur, GA 30033-4097

RE: Southern Christian University

Dear Ms. Wheelan:
I am in receipt of your letter dated January 4, 2006 where in you state that you have not found SCU in violation of the Accreditation regulations. I must disagree and request an appeal to a hire authority that oversees your agency.

First of all, your information about when a student is notified about the Practicum/Clinical Training site information is inaccurate. The truth is that a student never has this explained to them or even told to them until they ask for the Student Manual for MFT and PC clinicals. By this point, the student is already well into their educational process and cannot back out or transfer without loosing the majority of their credits.

Secondly, I took on the responsibility eagerly spending over 30 months (2.5 years) looking for a clinical training site, which included having to go out of my home state of CT and look in NY, NJ and finally move to DE. And I found many sites, but they would not take me because of my school's lack of personal rapport other than via email with them. They did not trust my school because as a distance-learning program with no physical or verbal contact, they were not sure whom they were actually speaking with.

Thirdly, as students we were not told when we research and inquired about the school or even when we were registering and applying for financial aid that finding a clinical training site would be extremely difficult.

Fourth, the school is and was well aware of this issue with the clinical training sites. In fact, during my practicum and clinical training class they conducted a survey solely about the clinical training problems and whether students would pay for the school to assist them in finding a site.

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

## No. 07-3376

---

### JOAN T. KLOTH,

Appellant,

v.

### SOUTHERN CHRISTIAN UNIVERSITY,
### BOARD OF DIRECTORS, *et al.,*

Appellees.

---

**On Appeal from the United States District Court
for the District of Delaware
Civil Action No. 06-CV-244 (SLR)**

---

## ORDER GRANTING APPELLEES' MOTION TO STAY APPELLANT'S APPEAL AND
## BRIEFING RELATED THERETO UNTIL FINAL ADJUDICATION
## OF APPELLANT'S MOTION FOR RECONSIDERATION

---

It is hereby ORDERED that Appellees' Motion to Stay Appellant's Appeal and Briefing related thereto is hereby GRANTED.  Until such time as the United States District Court for the District of Delaware has entered a final judgment relating to Appellant's Motion for Reconsideration, Appellant's Appeal and all related briefing thereto is hereby stayed.

BY THE COURT

Dated: _____, 2007          _____

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing *Appellees'*

*Motion To Stay Appellant's Appeal And Briefing Related Thereto Until Final Adjudication Of*

*Appellant's Motion For Reconsideration* was caused to be served on September 2̲8̲, 2007 upon

the following party at the record address for such *pro se* party by first-class mail, postage pre-

paid:

> Joan T. Kloth
> 320 North Georges Hill Road
> Southbury, CT 06488-2626

Michael P. Migliore (DE Bar #4331)